Quinter et ux., Appellants, *v.* Bloch et al.

Argued November 8, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Charles H. Weidner,* with him *Stevens & Lee,* for appellants.

*Thomas P. Mikell,* with him *Emanuel Weiss* and *Saul, Ewing, Remick & Saul,* for appellees.

OPINION BY CUNNINGHAM, J., March 4, 1938:

Defendants own and developed a plan of lots in Bern Township, Berks County, known as "West Shore Addition." In the spring of 1930, plaintiffs, husband and wife, bought two lots, each fronting 100 feet on the west side of West End Avenue, and paid for them at the rate of $10 per foot front. In the preliminary agreement of sale, dated April 30, 1930, and in the deed executed and delivered in pursuance thereof, under date of May 2, 1930, the lots are described as Nos. 181 and 182—No. 181 being the corner lot at the northwest corner of West End Avenue and Wilson Street. This lot, as well as the adjoining lot to the north—No. 182— is described as extending westwardly from West End Avenue to a right-of-way of the Reading Company in the rear.

Four years later, plaintiffs, alleging they had been induced to buy the lots by means of certain false and fraudulent representations made to them by Lucien Bloch, one of the defendants, acting on behalf of the partnership consisting of his father and himself, brought an action for deceit in the court below. They obtained a verdict for $2,075.66 as damages, including interest, but the court below, on August 10, 1936, made absolute the defendants' rule for judgment in their favor, notwithstanding the verdict; the present appeal is by the plaintiffs from the judgment so entered.

Three separate and distinct representations alleged by appellants to have been false and fraudulent were pleaded in their statement. The first was that during the preliminary negotiations instituted by appellees for the sale of lots from their plan appellants were taken to the premises where they were shown, and agreed to buy, two lots (Nos. 132 and 133) opposite the intersection of Roosevelt Avenue with West End Avenue, —Roosevelt Avenue being one block south of Wilson Street—, but in the written agreement the numbers

"181 and 182" were fraudulently inserted and subsequently carried into the deed, with the result that the lots actually conveyed to appellants were not the ones they had selected and believed they were buying. They also averred the lots conveyed to them "were less desirable and worth less than those which were pointed out [to them] and represented to them by [appellees] as the lots which were to be sold to [appellants]." Appellants' explanation of the way in which they had been deceived was that when the written agreement was presented for their signatures it contained no lot numbers in the spaces provided for such numbers and that the numbers "181 and 182" were subsequently inserted by the sellers; this was denied by appellees.

In submitting the case to the jury, the learned trial judge, SCHAEFFER, P. J., withdrew from their consideration the issues arising under this first branch of appellants' case. The grounds for the ruling, as explained to the jury, were (a) That the testimony by which appellants sought to repudiate their signatures to the agreement, was not so clear, precise and indubitable, as is requisite to sustain such a contention; and (b) That appellants, having elected not to rescind the contract but to keep lots Nos. 181 and 182, had failed to show that these lots were worth less than those which they contended they had agreed to buy.

Exception was taken by counsel for appellants to this ruling and it became the basis for the third assignment of error. We are not convinced appellants were entitled to go to the jury upon this phase of their case and the third assignment is accordingly overruled.

One of the distinctions between this case and that of *Bruce v. Loeb & Loeb*, 78 Pa. Superior Ct. 22, cited for appellants, is that in the Bruce case the purchaser offered to surrender the contract and demanded the return of his money.

The second alleged misrepresentation, as pleaded,

was that appellees, while showing the premises to appellants, fraudulently represented to them that a State Highway, referred to in the testimony as Route No. 310, had been so relocated by the highway authorities and the Governor that it would pass by the intersection of West End Avenue with Bernville Boulevard, two blocks south of Wilson Street, and that this relocated highway "would be built during the year." It may be noted that this alleged representation was, in part, a statement of an existing fact,—that the official action essential to the relocation had actually been taken—and in part a promise that something would be done in the future—that it would be built within the year. In submitting the issues upon this branch of the case, the trial judge correctly charged that the representations in a case of this type must be of existing facts, and, in this connection and with the consent of counsel, framed the following question to which the jury gave an affirmative answer: "During the negotiations leading up to the purchase did the defendant, Lucien Bloch, represent to the plaintiffs in substance that highway No. 310 had been relocated by official action of the Commonwealth of Pennsylvania, in such a manner that when built, it would pass through or by the development of West Shore Addition?"

The third misrepresentation alleged by appellants was that appellees falsely represented to them that one Henry A. Collins had bought from them certain lots adjacent to those shown appellants and had "paid $13 per front foot" for them. The trial judge framed and submitted to the jury a further question to which an affirmative answer was also returned: "During the negotiations leading up to the purchase, did the defendant, Lucien Bloch, represent to the plaintiffs that Henry A. Collins had agreed to pay the defendants $13 foot-front for certain lots in West Shore Addition?"

It was denied by appellees that these representations were made, but the jury found they were. Appellees admitted the highway had not been officially relocated and that Collins had paid only $10 per foot front for his lots. The trial judge properly charged that appellants had the burden of showing not only that the representations were made, had induced the purchase, and were false, but also of proving they had suffered actual damages thereby. The jury was further instructed that, as appellants had elected to keep the lots, the measure of any damages would be the difference, if any, between what they had been induced to pay and the fair market value of lots Nos. 181 and 182.

A three-fold defense was interposed by appellees. They contended, in the first place, that as there was testimony that appellants had been advised to write to the Governor with reference to the relocation of the highway, and as Collins was a friend and neighbor of appellants, the facts with reference to the representations were as readily ascertainable by appellants as by appellees, and, as there was no evidence that appellees sought to persuade appellants not to avail themselves of these sources of information, proof of such representations would not support an action for deceit. In this connection their counsel cite *Mahaffey v. Ferguson*, 156 Pa. 156, 169, 27 A. 21; *Moore et al. v. Steinman Hardware Company*, 319 Pa. 430, 179 A. 565; *Rothermel v. Phillips*, 292 Pa. 371, 377, 141 A. 241; and *Rockafellow v. Baker*, 41 Pa. 319.

In the next place, appellees rely upon the following provision in the agreement of sale as excluding any parol evidence of the representations relied upon by appellants: "6. This instrument covers all of the agreements between the parties, and neither party nor his or her agent or representative has made any statements or agreements, verbal or written, modifying or adding to the terms and conditions herein set forth."

Counsel for appellants practically concede that this provision would exclude evidence of any representations made by an agent of either party and not included in the instrument, but contend it does not prevent proof of fraudulent oral representations made by a principal.

The court below, as appears from its opinion denying appellees' motion for a new trial but making their rule for judgment n. o. v. absolute, adopted their contention with respect to the effect of the sixth clause of the agreement, saying: "In our case the parties provided that the signed contract covered 'all of the agreements between the parties and neither party . . . . . . has made any statements or agreements, verbal or written, modifying or adding to the terms or conditions herein, set forth.' This was an express waiver of all rights that arose from anything that preceded the execution of the written contract, and in accordance with precedent and reason the formal written contract so made must stand and be enforced in the absence of allegation in the pleadings and proof upon the trial that either the parol matters now relied upon were omitted from, or the clause excluding all other agreements was inserted in, that writing by fraud, accident or mistake. Here there is neither such averment nor proof."

This may be a sound foundation, under the facts in this case, for the judgment entered upon the whole record. It must be kept in mind that the representations here relied upon were made by one of the members of a partnership and that under the statute (Act of March 26, 1915, P. L. 18, 59 PS § 31) "every partner is an agent of the partnership for the purpose of its business."

On the other hand, it is conceivable that such fraud may be practiced in procuring a written contract as to make such a provision therein as is here set up a nullity in and of itself. The briefs for the respective parties and the opinion of the court below contain an able and

interesting discussion of the proposition and of its limitations.

We are satisfied, however, from our examination of this record that the case does not necessarily turn upon either the first or the second proposition advanced by appellees.

If this verdict should be sustained appellants would be permitted to keep the lots and recover substantially all they paid for them. The only just foundation for a judgment upon the verdict would be competent evidence sufficient in weight and quality to convince an impartial and reasonable person that appellants had actually suffered the damages awarded them.

The third contention of the appellees is that the record does not contain such evidence, and we are of opinion that this defense raises the pivotal point in the case.

For present purposes we lay aside the testimony of Seidel and Schmidt, real estate experts called by appellees and whose testimony was to the effect that the fair market value of lots Nos. 181 and 182 was $10 per foot front, and confine our consideration solely to the testimony with respect to damages submitted by appellants. The expert upon whose opinion they relied was W. K. Leinbach, a licensed real estate broker who had been in business for thirty years and who had been one of the appraisers for the Reading Company when it obtained, in 1929, a right-of-way along the western side of the plan. After the qualifications of the witness had been developed and passed upon by the trial judge he testified, in chief, as follows: "Q. Will you now state what is your opinion as to the market value of lots 181 and 182, which were conveyed to the Quinters in 1930? What, in your opinion, was their value on May 3, 1930? A. On May 3, 1930, I should say from $50.00 to $100.00 a lot. Q. Was that after the railroad had taken the right-of-way? A. Yes, sir."

It seems to us, however, that the cross-examination of this witness destroyed the entire effect of his testimony in chief and demonstrated that his opinion that the market value of the lots at the time they were conveyed to appellants did not exceed $100 each, was not supported by any of the recognized bases for an opinion relative to the market value of a piece of real estate. An excerpt from his testimony on cross-examination reads: "Q. Do you know of any land that was sold in that development on or prior to May 3, 1930, for less than $10.00 per front foot? A. I do not. Q. What other sales of lots prior to May 3, 1930, in this development do you know of? A. That I won't say. I think most of that went about 1930. Q. You know of some other sales that were made before May 3, 1930? A. I can't say. I think the Collins lots were sold about that time. The Zettlemoyer lots were after that. Q. What were the prices of those sales? By the way, did you take them into consideration in reaching this opinion. A. Yes, and the conditions. Q. What were the prices of these sales? A. As they told you, about $1000.00 a lot."

The witness was then asked whether he knew of sales of lots from the plan to six other named purchasers and replied that he had no knowledge of those sales. Another portion of his cross-examination follows: "Q. What sales do you know of? A. I know the Collins sale, the Zettlemoyer sale, and the sale to Olinger. Q. Where was that? A. That was farther down. That was a different location on the tract. Q. What were the prices of all of those sales? A. I should say approximately $1000.00 a lot. Q. $10.00 per front foot? A. I should say so, yes, sir. ...... Q. If I stated there were 300 [lots] in this development, would you say I was wrong? A. I think there might be a few less than that; I am not sure; I don't know that. Q. Do you know that al-

most all of these lots were sold in 1929 and 1930 at $10.00 a front foot? A. So I have heard."

This witness also testified that the Reading Company had paid approximately $10 per foot front for its right-of-way, some 1900 feet in length. It is significant that the sales of lots of which the witness had knowledge, and which he admitted had been sold at the price paid by appellants, took place after the right-of-way had been acquired. It also appeared from the testimony of this witness that there was easy access to the lots conveyed to appellants over "a good, paved, highway" thirty-three feet in width. The husband-appellant testified in his direct examination that Lucien Bloch, "one time in 1931 ...... he came down to my office, and he wanted to—offered me $2500.00 for the lots. I told him if I was to take—." The remainder of the answer was objected to as immaterial and the objection sustained.

Our conclusion is that the testimony of appellants' expert witness, taken as a whole, demonstrates that no jury could reasonably be permitted to find therefrom that there was any material difference between the fair market value of lots Nos. 181 and 182 and the price of $2,000 which appellants paid for them. Granting that the representations with reference to the relocation of the highway and the price paid by Collins were made and were false and that appellants were influenced by them, we are unable to find upon this record any evidence reasonably supporting a finding that appellants suffered any damages. The first and second assignments based upon the entering of judgment for the appellees, n. o. v., are also overruled.

Judgment affirmed.